UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LISA GAIL HOLLAND,

        Petitioner,

                              CASE NO. 2:09-CV-13863
   v.                           JUDGE PATRICK J. DUGGAN
                              MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
     D.    *Impartial Trial (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     E.    *Ineffective Assistance of Counsel (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     F.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . 22
         1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

\*     \*     \*     \*     \*


I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus.


II.    REPORT:


A.    *Procedural History*


      1.    Petitioner Lisa Gail Holland is a state prisoner, currently confined at the Huron

Valley Correctional Facility-Women's, in Ypsilanti, Michigan.

2.    On October 27, 2006, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316; and first degree child abuse, MICH. COMP. LAWS § 750.136b(2), following a jury trial in the Ingham County Circuit Court.  On November 28, 2006, the trial court vacated the child abuse conviction, which served as the predicate felony for the felony murder conviction, and sentenced petitioner to a mandatory term of life imprisonment without possibility of parole.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.    DEFENDANT WAS DENIED HER DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN THE TRIAL COURT DENIED A MOTION FOR CHANGE OF VENUE WHERE EXTENSIVE AND INFLAMMATORY PRETRIAL PUBLICITY PERMEATED THE COMMUNITY AND TAINTED THE ENTIRE JURY POOL.

A.    PRETRIAL PUBLICITY WAS EXCESSIVE AND ITS CONTENTS WERE INFLAMMATORY AND PREJUDICIAL RATHER THAN FACTUAL.

B.    STATISTICAL ANALYSIS SUPPORTS THE CONCLUSION THAT THIS TRIAL WAS UNFAIR WHERE SIXTY PERCENT OF THE FIFTEEN JURORS SEATED DISPLAYED THE SAME PATTERN OF PREJUDICE AGAINST DEFENDANT THAT WAS DISPLAYED THROUGHOUT THE COMMUNITY.

II.    DEFENDANT WAS DENIED DUE PROCESS AND HER FELONY MURDER CONVICTION MUST BE REVERSED BECAUSE THE JURY WAS PERMITTED TO CONSIDER A THREE-YEAR PERIOD OF ALLEGED ABUSE IN DETERMINING WHETHER THE MURDER OCCURRED IN THE PERPETRATION OF FIRST-DEGREE CHILD ABUSE.    DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE COURT'S INSTRUCTIONS ON FELONY MURDER AND CHILD ABUSE AND WHEN HE FAILED TO OBJECT TO THE COURT'S REFUSAL TO ANSWER A CRITICAL JURY QUESTION ABOUT CHILD ABUSE.

III.    THE COURT ABUSED ITS DISCRETION AND DENIED DEFENDANT

2

DUE PROCESS WHEN IT PERMITTED THE MEDICAL EXAMINER TO TESTIFY THAT SHE AMENDED HER CONCLUSION ABOUT CAUSE OF DEATH BASED ON THE TRIAL TESTIMONY OF TIMOTHY HOLLAND. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT PROPERLY TO THIS TESTIMONY.

IV.     DEFENDANT WAS DENIED DUE PROCESS WHEN THE PROSECUTOR WAS PERMITTED TO INTRODUCE, UNDER THE GUISE OF RES GESTAE OR SIMILAR ACTS, HIGHLY INFLAMMATORY CHARACTER EVIDENCE SPANNING A PERIOD OF YEARS; COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT FULLY TO THIS EVIDENCE.

    A.     THE EVIDENCE WAS INADMISSIBLE UNDER THE PROSECUTION'S RES GESTAE THEORY.

    B.     THE EVIDENCE WAS INADMISSIBLE UNDER THE PROSECUTIONS' OTHER ACTS THEORY.

V.      THE COURT ABUSED ITS DISCRETION AND DENIED DEFENDANT DUE PROCESS OF LAW WHEN IT PERMITTED EXPERT MEDICAL TESTIMONY ON MUNCHAUSEN BY PROXY AND ITS TWO COMPONENT PARTS OF PEDIATRIC CONDITION FALSIFICATION AND FACTITIOUS DISORDER BY PROXY BECAUSE THIS CASE IS INCONSISTENT WITH MUNCHAUSEN BY PROXY, THE EXPERT DID NOT APPLY PRINCIPLES AND METHODS RELIABLY TO THE FACTS AS REQUIRED BY MRE 702, THE EXPERT WAS FORCED TO FOREGO AN EXPLICIT DIAGNOSIS BECAUSE OF HER INABILITY TO COMPLY WITH MRE 703, AND THE PROSECUTOR THEN INVITED THE JURY TO MAKE ITS OWN MEDICAL DIAGNOSIS OF MUNCHAUSEN BY PROXY.

The court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence.

*See People v. Holland*, No. 275022, 2008 WL 2514188 (Mich. Ct. App. June 24, 2008) (per curiam).

    4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Holland*, 482 Mich. 1068, 757 N.W.2d 495 (2008).

    5.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus

3

on September 30, 2009.  As grounds for the writ of habeas corpus, she raises the impartial jury and various ineffective assistance of counsel claims that she raised in the state courts.

      6.      Respondent filed her answer on April 6, 2010.  She contends that petitioner's claims are without merit.

B.    *Factual Background Underlying Petitioner's Conviction*

      Petitioner's conviction arises from the July 2005 death of her seven-year-old son. Petitioner's trial spanned 29 trial days, covering over 5,100 transcript pages.  The voluminous evidence presented at trial was summarized by the Michigan Court of Appeals:

> This case arises out of the death of defendant's seven-year-old son Richard "Ricky" Holland in July 2005. Defendant and her husband, Timothy "Tim" Holland, accepted Ricky as a foster child when he was three years old. The Hollands subsequently adopted Ricky and his younger siblings. Two Department of Human Services (DHS) employees testified that before Ricky's death, the Hollands received subsidy payments from the state for their adopted children. They received approximately $450 per month over the standard subsidy rate because of Ricky's special needs.
>
> When the Hollands accepted Ricky as a foster child in 2000, they resided in Jackson, Michigan. In January 2001, defendant enrolled Ricky in a Head Start program for children with special needs. Ricky's teacher, Barbara Patrick, remembered Ricky being well behaved in class and she believed that defendant exaggerated Ricky's improper behavior to his doctors. Susan Honeck, a social services psychotherapist, saw Ricky on a weekly basis in 2001 and 2002. Like Patrick, Honeck observed Ricky exhibiting normal behavior. But, defendant complained that Ricky was defiant at home. In February 2002, Honeck found a deep rope burn on Ricky's wrist. Ricky attributed the burn to "the rope that they [tied him] in bed with at night."
>
> In the fall of 2002, Ricky started kindergarten in the Jackson public school system. At defendant's request, Ricky rode a special education bus and wore a harness. Defendant warned school personnel that Ricky was a "problem child" and asked that they give her written reports of his bad behavior. According to Ricky's bus driver and her attendant, Ricky was always well behaved and they generally removed his harness during the bus ride because, in their estimation, he did not need to wear it. They also gave Ricky food because he said that he did not have enough to eat and they noticed that his lunches generally consisted of plain bread and carrots. Ricky's first grade teacher similarly testified that although Ricky was generally very

good, she caught him stealing food two to four times a week. She also testified that defendant asked her to put Ricky in his harness every day before he left the classroom, but she refused to do so. Carol Coxon, a school nurse, testified that she once found nickel-sized bruises across Ricky's chest, shoulders, and back. Defendant said that Ricky's bus harness bruised him, but Coxon did not believe that the harness could have caused the bruising, and she learned from the school's transportation department that Ricky was no longer wearing his harness.

In March 2004, defendant asked the school to place Ricky in a special education program. Although defendant described Ricky in a negative light, the school psychologist and social worker found that he was well behaved, had average intelligence, and that he did not qualify for special education. Shortly thereafter, before the school year ended, defendant removed Ricky from the school. In the fall of 2004, defendant enrolled Ricky in a different elementary school in Jackson. School principal Randall Cook testified that the week before school started, defendant brought Ricky to the school on a leash and said that Ricky would be a difficult student. Within the month, school personnel met with defendant to inform her that Ricky was progressing well and that he did not qualify for special education. A few days later, defendant again removed Ricky from the school system.

Dr. Jerel Del Dotto, an expert in neuropsychology and assessment of children, conducted an assessment of Ricky in February 2001. Defendant indicated that Ricky was defiant, hyperactive, and distracted. But, the doctor and his psychometrist recalled Ricky being pleasant, cooperative, and intelligent. Dr. Del Dotto diagnosed Ricky with a disruptive behavior disorder and did not recommend any medication. Psychiatrist Aurif Abedi treated Ricky from September 2001 to July 2004. In assessing Ricky, Dr. Abedi primarily relied on defendant's representations about him. Dr. Abedi ultimately diagnosed Ricky with attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), bipolar disorder, and an impulse control disorder. Over the years, the doctor also became concerned with Ricky's physical growth. Ricky dropped from having an average weight in 2001 to being in the tenth percentile for weight in 2004.

In May 2005, when Ricky was seven years old, the Hollands moved from Jackson to Williamston, Michigan. Two of the Holland's Williamston neighbors testified that they found Ricky in their kitchen seeking food. On the morning of July 2, 2005, Tim telephoned 911 and reported Ricky missing. Within a few days, police formed a task force dedicated to locating Ricky. Hundreds of law enforcement officers and approximately 1700 civilian volunteers passed out flyers and searched a two to three-mile radius over nine days. A simultaneous search by aircraft covered a 20-mile radius. During the search, the Hollands were interviewed by the media and pleaded on camera for their son's safe return. Over the next few months, investigators continued to search for Ricky without success.

On January 26, 2006, after Tim had filed assault charges against defendant that were later dismissed, two detectives interviewed defendant at her request. During the interview, defendant said that Tim probably killed Ricky on the night he disappeared and she was afraid Tim would blame her for what happened. The next

day, Tim told a detective that defendant killed Ricky by striking him twice in the head with a hammer. Tim then led police to Ricky's body in a wetlands area near the Hollands' house. When they reached the site, Tim started to cry, fell to his knees, and said, "Oh, my God, what have I done." Tim was arrested later that night and defendant was charged with open murder and first-degree child abuse.

Crystal Mountain and Krystal Pierce testified that they were in jail with defendant in the spring of 2006. Each of the witnesses had several conversations with defendant. According to Mountain, defendant initially stated that Tim killed Ricky. Later, however, defendant admitted that she hit Ricky in the head with a hammer because he was "whiny," but that she did not mean to hit him as hard as she did. Defendant told Pierce that she did not mean to kill Ricky and that his death was an accident. Defendant said that she threw a hammer at Ricky because he ran through the living room and knocked over her knickknacks. After the hammer hit Ricky, defendant picked up the hammer and hit him in the head a second time. Defendant further indicated that Ricky did not die immediately and that he suffered before his death.

After his arrest, Tim pleaded guilty to second-degree murder and agreed to testify truthfully against defendant. At trial, he testified that defendant had "an immense hatred for Ricky." She frequently backhanded Ricky and struck him in the head and back with a heavy wooden spoon. On numerous occasions, Tim arrived home from work and found Ricky locked in his bedroom or the basement, with his hands, feet, and mouth duct taped and standing in a pool of urine. According to Tim, defendant removed Ricky from school because, in her opinion, Ricky was a "trouble maker," and because he did not qualify for special education. But, Tim never observed Ricky exhibit the negative behaviors defendant reported to others. Tim testified that defendant's only concern was increasing Ricky's subsidy payment rate.

Tim further testified that on June 20, 2005, he left on a business trip. When he returned home on Friday, June 24, he found Ricky in the living room with a "crusty" laceration on the right side of his head. Ricky wore only a diaper. He was dirty and smelly, had difficulty walking, and did not acknowledge Tim when he entered the house. Later that day, Tim confronted Lisa about the laceration. She said that Ricky hit his head in the kiddy pool, but Tim did not see the pool set up. Over the next few days, Ricky's condition worsened. He did not eat or drink and Tim changed his diaper. By Friday, July 1, Ricky stopped speaking, did not acknowledge Tim's presence, and felt stiff and cold to the touch.

On the evening of July 1, Tim put Ricky to bed and then left the house. Upon his return, he found Ricky lying in a fetal position with red vomit on his face. He was colder than before and had no pulse. At that point, defendant repeatedly screamed, "I didn't mean to do it," and instructed Tim to remove the body from the house. Later that night, Tim hid Ricky's body in the wetlands area, a location defendant had recently said would be a good place "to dump a body." The next morning, Tim telephoned 911 and reported Ricky missing. During the investigation, the Hollands recited a detailed, fabricated story about Ricky's disappearance. Then, in December

2005, when Tim attempted to use a tack hammer in the kitchen, defendant stopped him. She said, "That's the hammer that I hit Ricky with."

Dr. Todd Fenton and Dr. Joyce DeJong conducted the autopsy. Dr. Fenton testified that there was no evidence of skeletal trauma to the cranium, but there were fractures in the nasal region, the scapula, and the clavicle. The scapular fractures were consistent with child abuse. Further, although Ricky was almost eight years old when he died, his skeletal development was that of a five or six year old. Based on the condition of Ricky's skeleton and the evidence admitted at trial, Dr. DeJong attributed Ricky's death to complications from a head injury. Dr. DeJong further testified and opined that, based on Ricky's medical records and skeletal development, he suffered from a condition known as failure to thrive (FTT). Dr. Elaine Pomeranz, an expert in emergency pediatric medicine, forensic pediatrics, and child abuse, testified about munchausen syndrome by proxy (MSBP).

*Holland*, 2008 WL 2514188, at *1-*3.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Impartial Trial (Claim I)*

Petitioner first claims that she was denied a fair trial before an impartial jury because of inflammatory pretrial publicity. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

    1.      *Clearly Established Law*

Under certain circumstances, pretrial publicity can deprive a defendant of his right to a fair trial. The United States Supreme Court has held that pretrial publicity undermines the fairness of the judicial process when it is either "inherently prejudicial" or when it results in "actual prejudice." Publicity surrounding a judicial proceeding is inherently prejudicial when it fosters a circus-like atmosphere in the courtroom, draining the proceeding of the "solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). For example, in *Rideau v. Louisiana*, 373

U.S. 723 (1963), the Supreme Court found such inherent prejudice when a television station aired a 20-minute videotaped interrogation during which the defendant confessed to the crime for which he was eventually convicted.

Even if not so egregious as to create inherent prejudice, pretrial publicity may nevertheless give rise to an inference of actual prejudice. The nature and extent of pretrial publicity may have such a substantial effect on prospective jurors, as evidenced by the voir dire testimony, that a "fair trial [was] impossible." *Murphy*, 421 U.S. at 798. In *Irvin v. Dowd*, 366 U.S. 717, 727 (1961), the Supreme Court found extensive coverage of a defendant's past convictions and his offer to plead guilty to avoid a death sentence prevented a fair trial when nearly all of the prospective jurors reported some belief in the defendant's guilt.

In short, to be entitled to habeas relief on the basis of juror exposure to pretrial publicity, petitioner must show either "that prejudice should be presumed or that actual prejudice existed." *Turner v. Calderon*, 281 F.3d 851, 865 (9th Cir. 2002); *see also*, *Dobbert v. Florida*, 432 U.S. 282, 303 (1977); *Murphy*, 421 U.S. at 802.

    2.    *Analysis*

Here, there is no question that the crime with which petitioner was charged received extensive coverage in both the local and national media. *See* Pet., App'x C. Nevertheless, the Michigan Court of Appeals rejected petitioner's claim. The court of appeals first explained that although the media coverage of the search for Ricky, the discovery of his body, and the case against the Hollands was extensive, "a careful, independent review of the media reports reveals that the publicity was largely factual and was not invidious or inflammatory." *Holland*, 2008 WL 2514188, at *5. Distinguishing *Sheppard* and *Rideau*, in which the media coverage was inflammatory,

10

accusatory, and revealed information inadmissible at trial, the court of appeals reasoned that in petitioner's case "[t]he coverage . . . primarily covered testimony elicited during the preliminary hearing and other facts that were later admitted as evidence at trial." *Id.*

The court of appeals next noted that the trial court took steps to guard against the danger of prejudice arising from the pretrial publicity by summoning a large jury pool and having them fill out a written questionnaire drafted by the attorneys. One hundred six of the 184 potential jurors were dismissed based on their answers to the questionnaire. Seventy-one of the remaining 78 venire members were subjected to a sequestered *voir dire*. Of these, 17 were excused for cause due to bias, 16 were excused for reasons other than bias, 10 were peremptorily dismissed by the prosecutor, and 12 were peremptorily dismissed by petitioner. *See id.* at *6. The court of appeals rejected petitioner's argument that because 68% of the venire was excused for lack of impartiality, prejudice should be presumed. The court first questioned petitioner's 68% figure, noting that the screening process for the questionnaires took place off the record, and thus it could not be assumed that all of these jurors were dismissed due to bias arising from pretrial publicity. The court noted that the questionnaire included questions about the venire members' knowledge of the area and the Jackson Public Schools, as well as questions about hardships arising from potential jury service. *See id.* at *7. The court of appeals further noted that in *Irvin*, 90% of the prospective jurors had formed an opinion about the case, and two-thirds of those questioned during *voir dire* admitted to believing that the defendant was guilty. Here, on the contrary, the *voir dire* was sequestered, only 24% of those questioned on *voir dire* were excused for bias, and a number of the potential jurors had no or only limited knowledge of the case. *See id.* at *8. Further, unlike in *Irvin* where two-thirds of the jurors actually seated had formed an opinion on the defendant's guilt prior to trial, here the *voir dire*

11

revealed that "[o]f the 16 jurors selected to sit on the jury, one had no knowledge of the case, five knew very few facts of the case, and all 16 indicated that they had formed no opinion about the case." *Id*. The court of appeals therefore concluded that the trial court did not abuse its discretion in denying petitioner's motion for a change of venue. The Court should conclude that this determination was reasonable.

Here, petitioner has failed to show that she is entitled to a presumption of prejudice. As the Sixth Circuit has explained, "the few cases in which the Court has presumed prejudice can only be termed extraordinary." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). For example, in *Irvin*, *supra*, the defendant was accused of killing a family of six, a crime which "aroused great excitement and indignation" in the community; the pretrial publicity was pervasive and included details of the state's evidence, including the defendant's confession; and 90% of the jury venire, and 8 of the 12 jurors actually seated, had formed some opinion that the defendant was guilty. *See Irvin*, 366 U.S. at 719, 725-26. In *Rideau*, *supra*, the defendant's twenty minute videotaped confession was aired on local television for three successive days. *See Rideau*, 373 U.S. at 724. In *Sheppard v. Maxwell*, 387 U.S. 333 (1966), and *Estes v. Texas*, 381 U.S. 532 (1965), the trials took place in "circus atmosphere[s]" in "courthouse[s] given over to accommodate the public appetite for carnival" or "overrun with television equipment." *See Murphy*, 421 U.S. at 799 (discussing *Estes* and *Sheppard*). In short, prejudice is presumed only where the trial takes place in an "atmosphere utterly corrupted by press coverage," *Dobbert*, 432 U.S. at 303, or where the circumstances deny the defendant a courtroom characterized by "judicial serenity and calm," *Estes*, 381 U.S. at 536, such that the proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled." *Murphy*, 421 U.S. at 799.

Here, petitioner does not allege the type of circus-like proceedings that was involved in these cases and which is necessary to establish a presumption of prejudice. Although there was extensive coverage of the case, an independent review of the articles submitted by petitioner confirms the court of appeals's conclusion that this coverage was largely factual and revealed only matters that were later admitted at trial. "[I]t is well-settled that pretrial publicity itself–'even pervasive, adverse publicity–does not inevitably lead to an unfair trial.'" *DeLisle*, 161 F.3d at 382 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Further, petitioner does not allege that type of all-encompassing, prejudicial atmosphere in either the community or the courtroom that was present in *Irvin*, *Rideau*, *Sheppard*, and *Estes*, and thus she is not entitled to a presumption that the pretrial publicity rendered her trial fundamentally unfair. *See Dobbert*, 432 U.S. at 303; *DeLisle*, 161 F.3d at 383-86; *Bible v. Schriro*, 497 F. Supp. 2d 991, 1007-09 (D. Ariz. 2007).

Nor can petitioner demonstrate that the pretrial publicity resulted in actual prejudice. Petitioner points to no evidence that any of the jurors actually seated had prejudged her guilt or were biased against her. On the contrary, the trial judge took great pains to assure that the jury seated to try petitioner was untainted by the media coverage, first winnowing down the large pool of potential jurors through a questionnaire, and then conducting a sequestered *voir dire* so that one venire member's expressions of bias would not be heard by an unbiased venire member. Each of the seated jurors stated that he or she had not formed an opinion on petitioner's guilt, and could decide the case based solely on the evidence presented at trial. The Court presumes that these statements were truthful, and petitioner has pointed to nothing to call into question the sincerity of the jurors' assurances. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might hold and decide the case on the

13

evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim).

The reasonableness of the court of appeals's decision is demonstrated by a number of Supreme Court and court of appeals cases finding no actual or presumed bias where similar numbers of jurors were exposed to pretrial publicity, and where some jurors even had preformed opinions, unlike in petitioner's case. *See, e.g.*, *Yount*, 467 U.S. at 1027-30, 1040 (habeas relief denied where pretrial publicity covered petitioner's prior conviction for murder, confession, and prior plea of insanity, 161 or 163 venire members had heard of the case and 126 acknowledge they had formed an opinion of defendant's guilt, and 8 of 14 jurors actually seated had at some point formed an opinion of the defendant's guilt, but trial court found that jurors did not hold a fixed opinion when they were seated); *Murphy*, 421 U.S. at 800 (relief denied where 20 of 78 panel members excused for bias but the *voir dire* "indicate[d] no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside."); *Ritchie v. Rogers*, 313 F.3d 948, 957, 959 (6th Cir. 2002) (4 of 12 seated jurors had opinions, but they were "not firmly held"); *Hale v. Gibson*, 227 F.3d 1298, 1331-33 (10th Cir. 2000) (34 of 37 examined jurors had prior knowledge of case, 12 had opinions regarding defendant's guilt, and 6 of those 12 were seated on the jury).

The reasonableness of the Michigan Court of Appeals's determination is also demonstrated by the Supreme Court's recent decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010). That case involved the wire fraud prosecution of Jeffrey Skilling arising from the crash of the Enron Corporation. Skilling's trial occurred in Houston, where Enron was located. Thousands of Houstonians were directly or indirectly affected by the economic effects of Enron's collapse, and

14

both the company's collapse and the ensuing criminal cases resulting therefrom received extensive coverage in both the local and national media. This coverage included personal interest stories in which affected individuals expressed anger toward Enron. *See id*. at 2907-12. Similar to here, the trial court submitted a questionnaire drafted by the court and the parties to 400 prospective jurors. Of those, 90 individuals were granted hardship exemptions and another 119 were excused for cause, hardship, or disability. The remaining jurors were questioned individually outside the presence of other jurors regarding pretrial publicity. *See id*. at 2910-11.

The Supreme Court rejected Skilling's argument that he was denied a fair trial by the pervasive pretrial publicity. After explaining its prior holdings in *Rideau*, *Estes*, and *Sheppard*, the Court first rejected Skilling's claim that he was entitled to a presumption of prejudice, concluding that "[i]mportant difference separate Skilling's prosecution from those in which we have presumed juror prejudice." *Id*. at 2915. Significantly, and equally relevant here, the Court noted that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type that readers or viewers could not reasonably be expected to shut from sight," such as "Rideau's dramatically staged admission of guilt." *Id*. at 2916. The court rejected the Fifth Circuit's conclusion that "the magnitude and negative tone of media attention directed at Enron" supported a presumption of prejudice, reasoning that "'pretrial publicity–even pervasive, adverse publicity–does not inevitably lead to an unfair trial.'" *Id*. (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Further, the Court found that the "sheer number of victims" did not support a presumption of prejudice, because the trial court's "extensive screening questionnaire and follow-up *voir dire* were well suited to [the] task" of identifying prospective jurors' connections to Enron. *Id*. at 2917. Here, as in *Skilling*, the media coverage was not the type

15

of extensive, inflammatory coverage at issue in *Estes, Sheppard*, and *Rideau*, and the trial court's questionnaire and sequestered *voir dire* functioned to identify any potential jurors who had formed opinions based on their exposure to pretrial publicity. Thus, *Skilling* supports the reasonableness of the Michigan Court of Appeals's decision.

Further, *Skilling* supports the conclusion that petitioner suffered no actual prejudice. As in *Skilling*, the trial court engaged in an extensive written and oral *voir dire* process to fully explore the prospective jurors' biases, *see id*. at 2918, and "examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members." *Id*. at 2919. Further, as in *Skilling*, the trial court here instructed the jurors that they were to decide the case solely based on the evidence presented at trial. *See id*. at 2918 n.21. Here, as in *Skilling*, the trial court's extensive *voir dire* process "successfully secured jurors who were largely untouched by" pretrial publicity. *Id*. at 2920.[1]

Finally, petitioner has failed to show that any of the jurors seated were actually biased against her. It is true that some of these jurors had knowledge of the case from following news reports. None of those jurors, however expressed any opinion on petitioner's guilt, and each indicated that they had no opinion and could decide the case based on the evidence presented at trial. As the Court has repeatedly explained, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15 (emphasis in original); *see also*, *id*. at 2925. Indeed, it is not required that prospective jurors have formed no

---

[1]Petitioner contends that the bias of the jury is demonstrated by the fact that a large percentage of the venire members indicated on the questionnaires that they thought petitioner was guilty or responsible for the victim's death. As the Supreme Court explained, however, "[s]tatements by nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination of these venire members is indeed one indicator that the process fulfilled its function." *Skilling*, 130 S. Ct. at 2920 n.24.

16

opinions on the matter.  *See Murphy*, 421 U.S. at 800; *Irvin*, 366 U.S. at 722 (jurors are not required to be "totally ignorant of the facts and issues involved" and "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155-56 (1879).  The only relevant questions are whether the juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."  *Patton*, 467 U.S. at 1036. Here, a review of the *voir dire* does not demonstrate that any of the jurors specifically challenged by petitioner here had formed any opinion on the case, much less had petitioner demonstrated any reason why these jurors' protestations of impartiality should not have been believed by the trial court.

In short, petitioner "failed to establish that a presumption of prejudice arose or that actual bias infected the jury that tried [her]."  *Skilling*, 130 S. Ct. at 2925.  The Michigan Court of Appeals's determination, based on a thorough review of the facts and application of the relevant Supreme Court precedents, was therefore neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Ineffective Assistance of Counsel (Claim II)*

Petitioner next contends that her trial counsel was constitutionally ineffective in several respects.  Specifically, she contends that counsel was ineffective for failing to object to other acts evidence, improper jury instructions, and improper expert testimony.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

17

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed  questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.    *Analysis*

The Michigan Court of Appeals, reviewing the underlying claims for plain error, rejected each underlying claim on the merits, and then concluded that counsel was not ineffective.  The court first concluded that the Rule 404(b) evidence was admissible to establish petitioner's intent, motive,

or the *res gestae* of the crime. *See Holland*, 2008 WL 2514188, at *10-*13. The court then concluded that counsel was not ineffective because counsel in fact objected to the admission of this evidence, and in any event petitioner could not establish prejudice. *See id*. at *13. With respect to the jury instructions, the court concluded that the trial court's instructions on felony murder and first degree child abuse as a predicate felony for felony murder were proper under state law. *See id*. at *14-*15. The court of appeals therefore concluded that counsel could not be deemed ineffective for failing to object, because any objection would have been futile. *See id*. at *15. With respect to the expert testimony issue, the court of appeals concluded that Dr. DeJong's testimony was properly admitted under Rules 702 and 703, *see id*. at *16, and that counsel was therefore not ineffective for failing to raise a meritless objection to this testimony. *See id*. Similarly, the court of appeals concluded that Dr. Pomeranz's testimony regarding Munchausen Syndrome by Proxy was properly admitted under Rules 702 and 703. *See id*. at *17.

At the outset, the Court should reject petitioner's contention that the court of appeals's analysis of her ineffective assistance claims was unreasonable because it was cursory and did not apply the correct legal standard as set forth in *Strickland*. Contrary to petitioner's argument, the court did set forth the correct legal standard. The court noted that "[t]o establish ineffective assistance of counsel, defendant must show that defense counsel's performance was so deficient that it fell below an objective standard of reasonableness," and that "but for defense counsel's error, it is likely that the proceedings' outcome would have been different." *Id*. at *13. This accurately sets forth the *Strickland* standard. Further, in setting forth this standard, the court cited to *People v. Henry*, 239 Mich. App. 140, 145-46, 607 N.W.2d 767, 770 (1999). *Henry*, in turn, took its standard from *People v. Pickens*, 446 Mich. 298, 521 N.W.2d 797 (1994), and *People v. Stanaway*, 446 Mich.

20

643, 521 N.W.2d 557 (1994), both of which explicitly adopt and discuss *Strickland*.   As the Supreme Court has explained, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Here, it is clear that the Michigan Court of Appeals applied the proper standard in evaluating petitioner's ineffective assistance of counsel claims.  Further, even assuming petitioner's characterization of the court of appeals's decision as brief or conclusory is correct, this does not alter the standard of review under § 2254(d).  *See Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (in applying § 2254(d)(1), "we are determining the reasonableness of the state courts' 'decision,' not grading their papers.").

In any event, even under a *de novo* application of *Strickland* petitioner's ineffective assistance of counsel claims fail.  As explained above, the Michigan Court of Appeals rejected each of petitioner's underlying substantive claims, concluding that the other acts and expert evidence were properly admitted under state law, and that the trial court's jury instructions correctly explained state law governing first degree child abuse as a predicate felony for felony murder.  While petitioner challenges these conclusions regarding the admissibility of the hearsay evidence, neither the correctness of the Michigan Court of Appeals's application of the Michigan Rules of Evidence nor its interpretation of the felony murder statute is subject to review here.  It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  And it is equally well-established that "[a] determination of state law by a state appellate court is . . .

21

binding in a federal habeas action." *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007); *see also*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000) ("Principles of comity and finality equally command that a habeas court can not revisit a state court's interpretation of state law."). Thus, in analyzing petitioner's ineffective assistance claim, the Michigan Court of Appeals's conclusion that the evidence was properly admitted and its construction of the felony murder statute are binding. *See Narlock v. Hofbauer*, 118 Fed. Appx. 34, 34 (6th Cir. 2004) (per curiam); *Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). And because the evidence was admissible, and the jury instructions were proper, under state law, petitioner cannot show that any objection to the evidence or jury instructions would have been successful. It follows, therefore, that petitioner cannot show that she was prejudiced by counsel's failure to object. *See Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on her ineffective assistance of counsel claims.

F.      *Recommendation Regarding Certificate of Appealability*

        1.      *Legal Standard*

        As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this

22

language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not

issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

      Here, if the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability. With respect to petitioner's pretrial publicity claim, it is not reasonably debatable that the circumstances justifying a presumption of prejudice are not present here. As explained above, the circumstances of petitioner's case are far removed from those present in *Rideau*, *Irvin*, and *Sheppard*, a conclusion confirmed by the Court's recent decision in *Skilling*. Further, in light of the fact that the trial court engaged in an extensive selection procedure designed to weed out biased jurors, and in light of the absence of any evidence that the jurors who sat on petitioner's jury were biased, it is not reasonably debatable that petitioner has failed to demonstrate actual prejudice arising from the pretrial publicity. With respect to petitioner's ineffective assistance of counsel claims, it is not reasonably debatable that this Court is bound by the Michigan Court of Appeals's determinations that the evidence was properly admitted under state law and that the jury instructions accurately reflected the elements of first degree felony murder. Because counsel cannot be deemed ineffective for failing to raise a meritless objection, and because petitioner cannot show that she was prejudiced by counsel's failure to lodge objections which would have been overruled, it is not reasonably debatable that petitioner has failed to show that counsel was ineffective. Accordingly, the Court should deny petitioner a certificate of appealability.

G.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives_____
PAUL J. KOMIVES

25

UNITED STATES MAGISTRATE JUDGE

Dated: <u>11/29/11</u>

<div style="border:1px solid black;">

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on November 29,  2011.

<u>s/Eddrey Butts</u>
Case Manager

</div>